1    BARRETT S. LITT, SBN 45527                                              "O"
2    PAUL J. ESTUAR, SBN 167764
     E-Mail: pestuar@littlaw.com
3    LITT, ESTUAR, HARRISON &
     KITSON, LLP
4    1055 Wilshire Boulevard, Ste 1880
5    Los Angeles, California 90017
     Telephone: (213) 386-3114
6    Facsimile:  (213) 380-4585
7
8    ROBERT MANN, SBN 48293
     DONALD W. COOK, SBN 116666
9    E-Mail: doncook@earthlink.net
     ATTORNEYS AT LAW
10   3435 Wilshire Blvd., Suite 2900
11   Los Angeles, CA  90010
     Telephone: (213) 252-9444
12   Facsimile:  (213) 252-0091
13
14   Attorneys For Plaintiffs
15
16                    **UNITED STATES DISTRICT COURT**
17                    **CENTRAL DISTRICT OF CALIFORNIA**
18   KAREN CRAFT, et al.,              Case No.:  EDCV05-00359 SGL
19                Plaintiffs,          **ORDER AWARDING ATTORNEY'S**
20                                     **FEES AND COSTS.**
21   vs.
                                       DATE:    March 31, 2008
22   COUNTY OF SAN                     TIME:    10:00 A.M.
23   BERNARDINO, et al.,               CRTRM:   ONE
24                Defendants.
25
26
27
28
                                    1

## I.   INTRODUCTION

This case is a class action on behalf of various classes of inmates who were in San Bernardino County Jail. This action was filed on May 3, 2005. There are five classes certified by the Court. Plaintiffs filed a class certification motion, which was granted by the Court on October 11, 2006. Subsequently, in the context of the settlement of the case, the Court approved a refined and expanded class definition. The classes are now defined as follows.

a.   **Pre-Arraignment Strip Search Class**.  San Bernardino County Jail arrestees booked on offenses not involving weapons, violence or drugs who were transferred from a local Type 1 jail  (a Type 1 jail is a local detention facility used for the detention of persons for not more than 96 hours excluding holidays after booking) to a Type 2 jail (a Type 2 jail is a local detention facility used for the detention of persons pending arraignment, during trial, and upon a sentence or commitment) prior to arraignment and were, at the time of admission to the Type 2 jail, subjected to a strip search or visual body cavity search without reasonable suspicion or probable cause to believe  they were in possession of weapons or drugs, pursuant to a blanket policy, practice or custom of Defendants of strip searching all such arrestees.  The class period is May 3, 2003 –December 11, 2006.

b.   **US Marshal [aka USM] Strip Search Class**.  San Bernardino County Jail inmates who were in federal custody and who, pursuant to agreement between the United States and San Bernardino County, were housed in a San Bernardino jail facility, and who, upon being taken from federal to San Bernardino custody, were strip searched by the San Bernardino County Sheriff's Office without reasonable suspicion or probable cause to believe that they were in the possession of weapons or drugs, pursuant to a blanket  policy, practice of custom of Defendants of

strip searching all such transferees. The class period is May 3, 2003 – December 11, 2006.

c.        **Transport Strip Search Class**.  San Bernardino County Jail inmates who were in the custody of another law enforcement agency, and who were transferred to San Bernardino County custody to be arraigned on charges in San Bernardino County, and who, upon being taken into San Bernardino County custody, were strip searched by the San Bernardino County Sheriff's Office without reasonable suspicion or probable cause to believe that they were in the possession of weapons or drugs, pursuant to a blanket  policy, practice of custom of Defendants of strip searching all such transferees. The class period is May 3, 2003 – December 11, 2006.

d.        **Post-Release Strip Search Class**.  San Bernardino County Jail inmates who appeared in court, and, at the conclusion of their court appearance, were entitled to release and, prior to release, were subjected to a strip search or visual body cavity search without reasonable suspicion or probable cause to believe they were in possession of weapons or drugs, pursuant to a blanket policy, practice or custom of Defendants of strip searching all such inmates. The class period is May 3, 2003 – December 11, 2006.

e.        **Group Strip Search Class**.  County jail inmates who are not members of either the Pre-Arraignment, USM, Transfer or Post-Release Strip Search Classes who were subjected to a strip search or visual body cavity search in a group pursuant to the blanket policy, custom or practice of the San Bernardino County Jail of strip searching inmates in a group. The class period is May 3, 2003 – March 7, 2007.

The Plaintiffs filed a motion for partial summary judgment, which was opposed by Defendants. On December 7, 2006, the Court granted Plaintiffs' motion, finding that 1) the County's practice of routinely strip searching pre-

3

1   arraignment arrestees who were placed in a local County facility and then
2   transferred to its main detention centers at either Central Detention Center or West
3   Valley Detention Center violated the Fourth Amendment, and 2) the County's
4   practice of routinely strip searching inmates who appeared in court and were
5   ordered or became entitled to release from custody before releasing them violated
6   the Fourth Amendment. The Court's order considered the fact that strip searches
7   occurred in groups as a factor weighing against their constitutionality but did not
8   decide whether group strip searches independently violated the Fourth
9   Amendment. *See Craft v. County of San Bernardino*, 468 F.Supp.2d 172 (C.D.Cal.
10  2006).

11         Subsequently, the parties entered into mediation before an agreed upon
12  private mediator. After several sessions, the parties agreed to the basic terms of the
13  settlement, which include: 1) an estimated class fund of $25,500,000 (the exact
14  amount of which is $25,648,204; 2) a point system based upon the records of the
15  San Bernardino County Jail to determine how many points are awarded to the
16  Plaintiffs; 3) a special allocation of $200,000 to the seven Named Plaintiffs, to be
17  allocated as agreed to by them and their counsel; 4) a reserve to the class fund of
18  $648,204 that may be used to pay half of any opt-out fees and awards, any
19  remainder of which then goes to the remaining class fund for distribution to class
20  members, and 5) the Plaintiffs' right to seek an award not to exceed 25% of the
21  class fund, now determine to be $25,648,204. The Court has approved that
22  settlement in a separate order. See Final Order of Approval and Settlement,
23  concurrently filed herewith.

24         Plaintiffs filed a motion for attorneys' fees seeking 25% of the fund as a
25  class fund award. For the reasons stated below, the Court awards Plaintiffs'
26  counsel $6,375,000 (25% of the class fund) as attorneys' fees, plus $70,564.64 in
27  costs.

28

1   **II.     THE STANDARDS FOR AWARDING CLASS FUND ATTORNEYS'**
2   **FEES.**

3          It is well settled in the Ninth Circuit that, "[i]n a common fund case, the

4   district court has discretion to apply either the lodestar method or the percentage-

5   of-the-fund method in calculating a fee award." *Fischel v. Equitable Life*

6   *Assurance Soc'y of the U.S.,* 307 F.3d 997, 1006 (9th Cir.2002); *see also, e.g.,*

7   *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989); *In re*

8   *Washington Public Power Supply System Securities Litigation*, 19 F.3d 1291,

9   1295 (9th Cir. 1994)). While the court has discretion to use either method, "the

10  primary basis of the fee award remains the percentage method." *Vizcaino v.*

11  *Microsoft Corp*., 290 F.3d 1043, 1050 (9th Cir. 2002). *See also Six Mexican*

12  *Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1311 (9th Cir.1990)

13  ("benchmark percentage [of 25% of the fund] should be adjusted, or replaced by a

14  lodestar calculation, when special circumstances indicate that the percentage

15  recovery would be either too small or too large in light of the hours devoted to the

16  case or other relevant factors"); *In Re Rite Aid Corp. Securities Litigation*, 396

17  F.3d 294, 307 (3rd Cir. 2005)) ("the lodestar cross-check does not trump the

18  primary reliance on the percentage of common fund method").

19         The Ninth Circuit has "established 25% of the common fund as the

20  'benchmark' award for attorney fees." *E.g., Torrisi v. Tucson Elec. Power Co.,* 8

21  F.3d 1370, 1376 (9th Cir.1993); *see also Six Mexican Workers v. Arizona Citrus*

22  *Growers, supra*. Although not mandated by the Ninth Circuit, courts often consider

23  the following factors when determining the benchmark percentage to be applied:

24  (1) the result obtained for the class; (2) the effort expended by counsel; (3)

25  counsel's experience; (4) counsel's skill; (5) the complexity of the issues; (6) the

26  risks of non-payment assumed by counsel; (7) the reaction of the class; and (8)

27  comparison with counsel's loadstar. *See, e.g., In re Heritage Bond Litigation,* 2005

28

1  WL 1594403, 18 (C.D. Cal. 2005) (exercising discretion to award 1/3 of the class

2  fund as a fee). The Court will address each factor below.

3      A.    *The Complexity Of The Issues, Counsel's Skill and the Degree of*

4            *Risk Assumed By Counsel.*

5          Congress recognized the complexity of civil rights cases when the civil

6  rights attorneys' fee statute (42 U.S.C. §1988) was passed in 1976. *See* S.Rep.No.

7  94-1011, *1976 U.S. Code Cong. & Admin. News* at 5913 (civil rights fees should

8  "be governed by the same standards which prevail in other types of equally

9  complex federal litigation, such as antitrust cases"). The issues involved in this

10 case involve complex issues of constitutional law in an area where considerable

11 deference is given to jail officials, as this Court recognized in the partial summary

12 decision in this case. *See Craft v. County of San Bernardino*, 468 F.Supp.2d 1172,

13 1176 (C.D.Cal. 2006) ("As the Ninth Circuit has noted: 'We recognize the

14 difficulty of operating a detention facility safely, the seriousness of the risk of

15 smuggled weapons and contraband, and the deference we owe jail officials'

16 exercise of judgment in adopting and executing policies necessary to maintain

17 institutional security.' *Way v. County of Ventura,* 445 F.3d 1157, 1161 (9th Cir.

18 2006).")

19         The settlement in this case ultimately encompassed five categories of class

20 members. At the time this lawsuit was filed, the law was not settled in the areas

21 encompassed by the suit, and in some areas the law was very uncertain. All Ninth

22 Circuit decisions to date finding strip searches unconstitutional involved pre-

23 arraignment strip searches in the context of people not being placed in the general

24 population. *See, e.g., Way v. County of Ventura,* 445 F.3d 1157, 1159 (9th Cir.

25 2006) (pre-arraignment arrestees charged with being under the influence of drugs);

26 *Giles v. Ackerman,* 746 F.2d 614, 616-17 (9th Cir.1984) (per curiam) (pre-

27 arraignment arrestee charged with traffic violation), *overruled on other grounds by*

28 *Hodgers-Durgin v. de la Vina,* 199 F.3d 1037, 1040 n.1 (9th Cir.1999) (en banc);

1   *Kennedy v. Los Angeles Police Dep't,* 901 F.2d 702, 711 (9th Cir.1990) (as

2   amended) (pre-arraignment arrest for felony grand theft), *implied overruling on*

3   *other grounds recognized by Act Up!/Portland v. Bagley,* 971 F.2d 298, 301 (9th

4   Cir.1992); *Fuller v. M.G. Jewelry,* 950 F.2d 1437, 1446 (9th Cir.1991) (same).

5          The issues presented by this case did not fit into this well established area of

6   the law. The first class certified in the list of classes finally certified in this action

7   (Class "a", above, Pre-Arraignment Strip Search Class) were not direct pre-

8   arraignment arrestees but pre-arraignment transferees from another jail. In fact, the

9   summary judgment decision in this case regarding the constitutionality of these

10  strip searches entailed a complex and subtle analysis of the factors involved in

11  determining the unconstitutionality of the strip/visual body cavity search policy,

12  and there were no cases directly on point. *See Craft v. County of San Bernardino*,

13  468 F.Supp.2d 1172 (C.D.Cal. 2006).  The issues of federal transferees (Class "b",

14  above, US Marshal Strip Search Class), and transferees from a non-San Bernardino

15  jail (Class "c", above, Transport Strip Search Class) posed potentially more

16  difficult problems. These two issues were agreed to during settlement negotiations

17  and were never ruled on by the Court.

18         The fourth class finally certified by this Court involved the policy of

19  strip/visual body cavity searches of post-release inmates. (See Class "d", above,

20  Post-Release Strip Search Class.) At the time the complaint was filed, there was

21  one district court decision that had ruled factually, as opposed to denying a motion

22  to dismiss on the issue, that such a policy was unconstitutional (as distinct from

23  cases finding a particular incident unconstitutional). *Gary v. Sheahan*, 1998 WL

24  547116 (N.D. Ill.). Subsequently, there has been a district court decision finding

25  such a policy unconstitutional. *Calvin v. Sheriff of Will County*, 405 F. Supp. 2d

26  933, 946 (N.D.Ill. 2005). There has also been a Circuit Court decision to that effect

27  – *Powell v. Barrett*, 496 F.3d 1288 (11th Cir. 2007) (finding no qualified immunity

28  for the policy) – but the Eleventh Circuit has since granted re-hearing en banc.

The fifth class finally certified by the Court was the policy of conducting strip/visual body cavity searches in a group. (See Class "e", above, Group Strip Search Class.) This class was not separately briefed on summary judgment, but was considered on that motion only as it was a factor in the pre-arraignment and post-release searches. While there is ample law on the fact that privacy is a factor in the overall assessment of the constitutionality of a strip search (*see, e.g.*, *Craft v. County of San Bernardino*, 468 F.Supp.2d 1172, 1176 (C.D. Cal. 2006)(citing cases for fact that group nature of strip searches of pre-arraignment arrestees is a factor in determining that the searches violated the Fourth Amendment)), there is very little stating that a strip search in a group setting is in and of itself a constitutional violation. Plaintiffs have called only two cases to the Court's attention finding a policy of group strip searches unconstitutional, despite language in many others implying that conclusion. One is a 22 year old case granting an injunction, and the other is a case after this action was filed on a motion to dismiss (in which Mr. Litt is also counsel). Neither is a court of appeals decision. *See Smith v. Montgomery County, Md.*, 547 F.Supp. 592, 599 (D.Md. 1982) (*Smith I*) (enjoining, *inter alia*, any policy that permitted conducting visual searches other than in private; "with respect to conducting a strip search in private, even if all defendants' arguments were accepted, there is no reason why the initial search of incoming detainees cannot be done in private"); *Smith v. Montgomery County, Md.*, 607 F.Supp. 1303 (D.C. Md. 1985) (*Smith II*) (emphasis supplied)(new judge in the same case affirmed the injunction previously entered; no qualified immunity); *Jones v. Murphy*, 470 F.Supp.2d 537, 548 (D.Md. 2007)(arrestees subject to policy of "being strip searched in a non-private setting also violates what appears to be a clearly established right in the Fourth Circuit").

As a general proposition, "the case law in this area [jail strip searches] is far from stable." *McBean v. City of New York*, 233 F.R.D. 377, 387 (S.D.N.Y. 2006) (approving class settlement, and noting that the leading case in the Second Circuit

8

on the issue had been from a divided panel, with one judge dissenting and one concurring based on established precedent). *See also Evans v. Stephens,* 407 F.3d 1272 (11th Cir.2005) (en banc) (suggesting in dicta that entry into the general population may be a per se justification for a strip/visual body cavity search but not deciding the issue in that case). The instability of the case law in this area is clearly illustrated by the history of *Powell v. Barrett*, *supra*, 496 F.3d 1288 (11th Cir. 2007) (finding no qualified immunity for policies of routinely strip searching pre-arraignment and post-release inmates). The Eleventh Circuit granted rehearing en banc in the case on February 1, 2008, although no motion for rehearing was filed. The Circuit's grant of en banc review in such circumstances suggests the possibility that the Eleventh Circuit will adopt a markedly different analysis from that of the Ninth and other Circuits in this complex and difficult area of the law. This evidences the risk for Plaintiffs' counsel inherent in litigation of this type.

Declarations filed in support of Plaintiffs' motion for attorneys' fees from experienced class and civil rights lawyers noted several particular difficulties in litigation of this kind, including 1) particular challenges and expertise required to establish a policy or custom under *Monell v. Dept. Soc. Serv.,* 436 U.S. 658, 690 (1978), 2) great deference is given to jails in addressing security issues, 3) the law often differs from circuit to circuit, and 4) there is a greater risk than normal that the whole legal landscape could change by virtue of a change in the law, particularly if the Supreme Court addresses the issue (which it has not done in the area of strip searches of pre-trial detainees since *Bell v. Wolfish*, 441 U.S. 520 (1979), almost 30 years ago. The Court agrees that all of these reflect risks for Plaintiffs' counsel in pursuing litigation of this type.

In addition to the risk of establishing liability, class certification carries risks and requires experienced class counsel. Whether to certify a class rests within the sound discretion of the court. *See, e.g., Staton v. Boeing Co.,* 327 F.3d 938, 953 (9th Cir.2003). *Armstrong v. Davis,* 275 F.3d 849, 867 (9th Cir.2001) (district

1    court's decision to certify a class is subject to "very limited" review and will be

2    reversed "only upon a strong showing that the district court's decision was a clear

3    abuse of discretion") (citation omitted); *Gonzales v. Free Speech Coal.,* 408 F.3d

4    613, 618 (9th Cir.2005) ("[a]buse of discretion is 'a highly deferential standard';

5    review 'is limited to assuring that the district court's determination has a basis in

6    reason'") (citation omitted). Courts have declined class certification in strip search

7    cases. *See, e.g., Noon v. Sailor*, 2000 WL 684219, 1 (S.D.Ind. 2000) (denying

8    motion to reconsider denial of class certification, citing manageability and broad

9    district court discretion). Certifying damages classes where the damages are not

10   susceptible of mathematical calculation, as here, is also a challenge for plaintiffs'

11   counsel. *See, e.g., Allison v. Citgo,* 151 F.3d 402, 415 (5th Cir.1998) (damages in

12   Title VII case are too individualized to be incidental to injunctive relief;

13   suggesting, in upholding denial of certification of 23(b)(3) class, that

14   individualized damages determinations make it difficult if not impossible to meet

15   the superiority and manageability requirements of Rule 23(b)(3)).

16        Aside from the complexity of the legal issues, there are other complexities.

17   Data analysis in a case such as this is complex, requiring a high degree of

18   sophistication and background in such analyses. Analysis of the Defendant's data

19   is the basis of determining class membership and entails writing specialized code

20   to determine who belongs in each class, based on the particular facts and issues of

21   each case. Mediation requires reaching a mutual agreement on analyzing the data,

22   as well as issue involving the structure of the class fund, its administration and the

23   like.

24        All these considerations are factors in determining both the complexity of

25   the case and the degree of risk involved in the litigation. Even with the body of law

26   in areas clearer than most involved here, substantial uncertainty and risk exists in

27   pursuing any strip search claims against jails and in obtaining class certification,

28   and the quality of the representation makes a large difference. For the reasons

1    stated, plaintiffs' counsel brought to bear substantial expertise, addressed and

2    obtained favorable rulings on several complex issues, and faced substantial risk of

3    non-payment. The risk lay in establishing liability, in obtaining class certification –

4    both of which were vigorously contested – and in reaching a favorable settlement.

5        Class counsel declined substantial other work to pursue this case. Mr. Litt

6    and Mr. Estuar, who concentrate more or less exclusively on civil rights class

7    actions, handle only about 10-12 cases at a time, for each of which it is anticipated

8    that in the range of 1500-5000 hours or more will be required to see the case to

9    completion. In this case, by the conclusion of the case, well over 2000 hours will

10   have been expended on the case.

11   **B.      *Counsel's Experience***

12       Class counsel are highly experienced and highly regarded civil rights

13   lawyers, with extensive class action experience. Mr. Litt is a well known and

14   highly regarded civil rights lawyer specializing in civil rights class actions,

15   especially law enforcement class actions. He has been lead counsel in two other

16   eight figure strip search settlements aside from this one, and is lead counsel in

17   several other pending strip search class actions in California, Washington D.C.,

18   Maryland and Georgia. He has several seven figure, and one eight figure, civil

19   rights trial verdicts. With this case, he will have been lead counsel in three of the

20   four largest strip search cases, measured in terms of monetary recovery, in the

21   United States. Mr. Estuar has worked with Mr. Litt for many years and also

22   specializes in complex civil rights litigation, and has worked with him on the strip

23   search cases described above. The other class counsel in this case – Mr. Mann and

24   Mr. Cook – have long histories of working on law enforcement civil rights cases in

25   general, including several law enforcement civil rights class actions. They

26   specialize in police misconduct cases and have handled hundreds of such cases.

27

28

### C.     The Effort Expended By Counsel.

Counsel litigated this case to the eve of trial. This entailed the following efforts by Class Counsel: 1) extensive investigation of the underlying circumstances, including obtaining questionnaires and interviews with many class members; 2) preparation of the complaint; 3) the Rule 26 conference and report; 4) 2 requests for production of documents; 5) extensive analysis of hard copy documents produced  6) 1 set of interrogatories, 7) 14 depositions, 8) a stipulated protective order, 9) a discovery motion, 10) extensive analysis of computerized jail data; 11) successful motions for class certification and partial summary judgment, 12) extensive mediation efforts (including multiple mediation sessions), 13) preparation of complex settlement documents, and 14) handling class administration issues and class inquiries from the Preliminary Approval to the Final Approval of the settlement. In summary, Class Counsel's efforts were extensive, and involved all that occurs in a case that is litigated up to the eve of trial.

### D.     The Result Obtained For The Class

This case was hard fought. Only after plaintiffs obtained partial summary judgment on two of the key issues in the case did defendants change their practices and open settlement discussions. The class members were paupers or low income persons, and unable to pay Class Counsel for their time. The settlement was the result of arm's length negotiations entered only after plaintiffs obtained class certification and partial summary judgment. The settlement negotiations were conducted with the assistance of an independent mediator. Due exclusively to Class Counsel's efforts, the class fund was created in the estimated amount of $25,500,000.

There were approximately 150,000 class members in the various classes based on the County's data, and over 20,000 claims filed. Unlike most class actions, plaintiffs were persons charged with crimes and, thus, not people generally

12

considered sympathetic or desirable by the public at large. *See, e.g., Battle v. Anderson* 564 F.2d 388, 398 (10th Cir. 1977) (in prisoner civil rights class action, "plaintiffs' class are generally a feared and despised class"); *Morales Feliciano v. Hernandez Colon*, 697 F.Supp. 51, 60 (D.Puerto Rico 1988) ("The general population's attitude toward those who commit or are accused of committing crimes is understandably one bordering in despise. Many Puerto Ricans believe that since plaintiffs are criminals, they deserve the conditions under which they live in the prisons.").

According to Class Counsel, this settlement represents the second largest total monetary settlement ever reached for strip searches in the United States. There are two other comparable cases in terms of size. One is *Tyson v. City of New York*, 97-CV-03762 (S.D.N.Y.), a case settled several years ago for an amount ranging from $19.5 Million to approximately $51 Million, depending on the extent of the claims made. That case, unlike this one, addressed only cases involving settled law, i.e., traditional pre-arraignment strip searches conducted without reasonable suspicion.

In this case, there were five groups ultimately settled, as discussed previously. One involved pre-arraignment strip searches of those transferred from other San Bernardino County jails; this class covered only a few thousand of the approximately 150,000 class members. Unlike the New York case, even the law on this issue was not settled because these were transferees, rather than direct arrestees, as was the case in New York. The other issues in this case involve considerably less settled law than in *Tyson*.

The second comparable case, also handled by the same counsel as here, is *Williams v. Block*, *supra*, Case No. CV 97-03826-CW (C.D. Cal. 2001). That case involved a $27 Million settlement, covering two classes – a class of inmates overdetained after they became entitled to release, and a class of inmates strip searched after they became entitled to release. The parties estimated for settlement

13

1 purposes that the two classes had approximately equal value, thus valuing the strip

2 search class at approximately $13.5 Million. In addition, in the LA case, the time

3 period covered was longer, the LA County jail is larger, and the number of

4 potential strip search class members was greater than here. See Declaration of

5 Barrett S. Litt. Thus, by contrast, the settlement here was both more substantial and

6 addressed several issues not involved in *Williams*.

7    Nor can the results in this case be judged solely by the monetary component

8 of the settlement. Due to the litigation, the County has stopped all of the strip

9 search practices addressed in this settlement. See Preliminary Approval Order,

10 ¶14. That is a major accomplishment, independently of the monetary settlement.

11 "Attorneys' fees [in class action cases] may be awarded even though the benefit

12 conferred is purely non-pecuniary in nature." *Merola v. Atlantic Richfield Co.,* 515

13 F.2d 165, 169-70 (3d. Cir.1975) (citing *Mills v. Elec.; see also Hall v. Cole,* 412

14 U.S. 1, 7 n.5 (1973) ("the rationale of …[the class fund doctrine] must logically

15 extend, not only to litigation that confers a monetary benefit on others, but also to

16 litigation 'which corrects or prevents an abuse which would be prejudicial to the

17 rights and interests' of those others.") (Citations omitted.). As a result of counsel's

18 efforts, hundreds of thousands of future inmates have been spared the

19 "embarrassing and humiliating experience", and "extensive intrusion on personal

20 privacy", that a strip search necessarily entails. *Hunter v. Auger,* 672 F.2d 668, 674

21 (8th Cir.1982).

22    **E.**  **The Reaction Of The Class**

23    Claim forms were mailed to 150,084 class members. There were 20,350

24 timely claim forms, and 781 late claims. There were 48 timely opt-outs, eight

25 people who timely filed opt-out notices and claims, and up to 13 timely objections.

26 The objections were addressed in the Order of Final Approval and Settlement; two

27 are likely not objections at all, and none raised any substantive issues regarding the

28 fairness of the settlement from a class perspective. This is a highly favorable

reaction by the class to the settlement. *Compare, e.g., Hughes v. Microsoft Corp.,* 2001 WL 34089697, 8 (W.D.Wash. 2001) (court found that the "class members overwhelmingly support[ed] the settlement" where there were over 37,000 notices sent out, 2,745 class members participated in the settlement, "only nine objections were submitted", and there were 86 timely opt-outs and over 20 additional defective or untimely opt-outs;  "these indicia of the approval of the class of the terms of the settlement support a finding of fairness under Rule 23"), citing *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1027 (9th Cir.1998) (despite vigorous objections and appeal by objectors, "fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness"; court did not abuse its discretion in approving settlement); *Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173, 1178 (9th Cir.1977) (approximately 1% of 31,000 class members opted out; "the fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness"). Here, the opt-outs were less than 1/30[th] of 1% of the class, and there was only a handful of objections, indicating overwhelmingly strong support by the class for the settlement.

### F.    *Comparison With Counsel's Lodestar.*

A lodestar cross-check is not required in this circuit, and in some cases is not a useful reference point. *See, e.g., Glass v. UBS Financial Services, Inc*., 2007 WL 221862, 16 (N.D.Cal. 2007) (no lodestar cross check conducted in an early settlement of the case, although 8 class members (out of 13,176) and the New York attorney general objected to the settlement, 280 class members opted out, and the New York attorney general and at least two of the class members objected to the 25% of the fund request as excessive; court awarded fees of $11,250,000 despite the fact that the $45 Million fund was subject to a reversion for unclaimed funds).

1   Nonetheless, plaintiffs, without request by the Court, presented their lodestar to

2   allow it to do a lodestar check if it so wished.

3           The Court has conducted a lodestar cross-check. Plaintiffs provided detailed

4   documentation of their time. Plaintiffs established a lodestar of approximately $1.2

5   Million (including post-approval projected time). They submitted rates ranging

6   from a high of $725 per hour for Mr. Litt (an attorney with 38 years experience) to

7   a low of $275 for 2006 graduates, as well as law clerk rates of $200 per hour and

8   paralegal rates from a low of $110 to a high of $225 per hour. In addition, they

9   submitted documentation showing costs in the case amounted to $70,564.64, the

10  largest component of which was payment to their data consultants.

11          Plaintiffs' counsel are experienced civil rights litigators who are at the top of

12  their field of expertise – civil rights litigation with special expertise in civil rights

13  class actions. Plaintiffs' counsel's hourly rates are addressed and supported by

14  numerous declarations filed with this motion. These declarations establish that the

15  hourly rates set are similar to those for attorneys of comparable skill and

16  experience at the rates paid for complex federal litigation, which was Congress'

17  intent for civil rights cases. *See City of Riverside v. Rivera*, 477 U.S. 561, 575-576

18  (1986) (quoting Senate Report, at 6, U.S. Code Cong. & Admin. News 1976,

19  p.5913, *supra*, (Congress intended civil rights fees to be comparable to that for

20  "other types of equally complex Federal litigation, such as antitrust cases"). 

21  Counsel established that the rates requested were their normal hourly rate for civil

22  rights litigation, that these are the rates they charge private clients on the rare

23  occasions that they do retained work, and that they have frequently been awarded

24  their current rates in civil rights cases in attorney fee motions. The Court finds that

25  the rates sought are reasonable and reflect the market for attorneys of comparable

26  skill, experience and expertise in complex federal litigation.

27          The Court further notes that plaintiffs' counsel's time in this case is likely as

28  low as it is due to plaintiffs' counsel exceptional experience in litigation of this

type. Without such expertise, it is likely that the hours would have been significantly higher to achieve the same result. Other counsel, even those experienced in civil rights litigation, would likely have had to expend considerably more time to accomplish the same result.

The plaintiffs' request in this case for 25% of the class fund would result in a fee of $6,375,000, which is a multiplier of approximately 5.2 times the $1.2 Million lodestar in this case. The Court has concluded that it will award Class Counsel 25% of the class fund, and addresses the reasons for doing so below.

## III.    THE COURT AWARDS CLASS COUNSEL 25% OF THE CLASS FUND.

Although, as noted previously, it is well settled in the Ninth Circuit that a court has discretion to award either a percentage of the class fund or a lodestar award in a class fund attorney's fee, the "the primary basis of the fee award remains the percentage method," *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002), a reflection of the general trend towards the percentage of the fund method to award class attorneys' fees. *See, e.g., Camden I Condominium Ass'n v. Dunkle,* 946 F.2d 768, 774 (11th Cir.1991) ("percentage of the fund approach is the better reasoned in a common fund case"); *In Re Rite Aid Corp. Securities Litigation*, 396 F.3d 294, 307 (3rd Cir. 2005)) ("the lodestar cross-check does not trump the primary reliance on the percentage of common fund method"). This method aligns the interests of counsel and the class by allowing class counsel to directly benefit from increasing the size of the class fund. *See Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1266-67 & fn.3, 1271 (D.C.Cir.1993) (noting that the lodestar approach "encourages significant elements of inefficiency", by giving attorneys an "incentive to spend as many hours as possible" and "a strong incentive against early settlement"; the percentage of the fund approach "more accurately reflects the economics of litigation practice", and "the monetary amount of the victory is often the true measure of success, and therefore it is most efficient that it

influence the fee award"; accordingly, "we join the Third Circuit Task Force and the Eleventh Circuit, among others, in concluding that a percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in common fund cases"); *Gaskill v. Gordon*, 160 F.3d 361, 363 (7th Cir. 1998) (in "defining a reasonable fee in representative actions, the law should 'mimic the market"); *accord*, *Lealao v. Beneficial Cal., Inc.*, 82 Cal.App.4th 19, 47) (2000) (quoting *Gaskill, supra*); *Ketchum v. Moses,*  24 Cal.4th 1122, 1132 (2001) ("purpose of a fee enhancement or so-called multiplier for contingent risk is to bring the financial incentives for attorneys enforcing important constitutional rights . . . into line with incentives they have to undertake claims for which they are paid on a fee-for-services basis"). *See also* Silber and Goodrich, *Common Funds and Common Problems: Fee Objections and Class Counsel's Response*, 17 RevLitig 525, 534 (1998) (the percentage of the fund approach avoids numerous drawbacks of the lodestar approach and is preferable because "the attorneys will receive the best fee when the attorneys obtain the best recovery for the class. Hence, under the percentage approach, the class members and the class counsel have the same interest-- maximizing the recovery of the class"); *In re Remeron Direct Purchaser Antitrust Litigation,* 2005 WL 3008808, 16 (D.N.J. 2005)(citing cases) (attorneys "regularly contract for contingent fees between 30% and 40%").

Silber and Goodrich, *supra*, advocate that class fund fees should not diminish on a percentage basis, as some courts have done, because that undermines the full alignment between class counsel and the class. This is because, if the percentage of fees go down as the size of the fund goes up, a substantial increase in the size of the fund may be only marginally beneficial to the class counsel while it may be extremely beneficial to the class, with the result being that the economic interests of the class and counsel become mis-aligned. They reviewed two studies of fee awards in common fund cases. One study, done of four districts in 1996 by the Federal Judicial Center, found that most fee awards in common fund class

1   actions were between 20% and 40% of the gross monetary settlement, with little

2   variation between districts. The other study, done by National Economic Research

3   Associates, an economics consulting firm, in 1994, found that attorneys' fees in

4   these class actions averaged approximately 32% of the recovery, regardless of the

5   case size, and averaged 34.74% when the fees and expenses were added together.

6   *Id.* at 545-546. Silber and Goodrich conclude with the observation that a 33% fee

7   award is both reasonable, and in line with the general market for contingent fee

8   work. *Id.* at 546-549.

9       Several courts have noted the limitations of the lodestar method in class

10  cases. *See  e.g., Vizcaino v. Microsoft Corp*., 290 F.3d 1043, 1050 (9th Cir. 2002)

11  ("it is widely recognized that the lodestar method creates incentives for counsel to

12  expend more hours than may be necessary on litigating a case so as to recover a

13  reasonable fee"); *Mashburn v. National Healthcare, Inc.,* 684 F.Supp. 679, 689-91

14  (M.D.Ala.1988) (cataloguing criticisms of the lodestar approach to fee

15  calculation); *see also Manual for Complex Litigation* 4th Ed. §14.121 (2004) ("in

16  practice, the lodestar method is difficult to apply, time consuming to administer,

17  inconsistent in result, …capable of manipulation, …[and] creates inherent

18  incentive to prolong the litigation").

19      In this case, plaintiffs are seeking a 25% of the fund award. This 25%

20  reflects the Ninth Circuit's benchmark in class fund cases. *E.g., Torrisi v. Tucson*

21  *Elec. Power Co.,* 8 F.3d 1370, 1376 (9th Cir.1993); *Six Mexican Workers v.*

22  *Arizona Citrus Growers,* 904 F.2d 1301, 1311 (9th Cir.1990). Higher awards are

23  available when they are warranted under the circumstances. *E.g., In Re Pacific*

24  *Enterprises Securities Litigation* (9th Cir. 1995) 47 F3d 373, 378-379. The 25% is

25  substantially below the average class fund fee nationally and below what Mr. Litt

26  has received in two other strip search cases. See Litt Declaration (noting award of

27  1/3 of the class fund in *Bynum v. District of Columbia*, 412 F. Supp. 73 (D.D.C

28  2006) and 35.47% of the class fund in *Williams v. Block, supra*).

A 25% of the fund award will result in a multiplier of approximately 5.2. While this is a high end multiplier, there is ample authority for such awards resulting in multipliers in this range or higher. *See, e.g., In Re Merry-Go-Round Enterprise, Inc.* (Bankr. D. Md. 2000) 244 B.R. 327 (40% award for $71 million fund awarded, resulting in a cross-check multiplier of 19.6); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, 2005 WL 1213926 (E.D.Pa.) ($100 Million class fund in antitrust case, with an award of 20% of the fund, which amounted to a multiplier of 15.6); *In re Rite Aid Corp. Sec. Litig.,* 146 F.Supp.2d 706 (E.D.Pa.2001) (in $193 Million fund, class counsel awarded fee of 25% of fund, which amounted to $48 Million and represented a multiplier of 4.5-8.5, which the court described as "handsome but "unquestionably reasonable"); *In re Cendant Corp. PRIDES Litigation*, 243 F.3d 722, 732 (3rd Cir. 2001) (5.7% of $341,500,000 settlement awarded, resulting in multiplier of 7); *In re Rite Aid Corp. Sec. Litig,* 362 F.Supp.2d 587 (E.D.Pa. 2005) (25% of $126,800,000 fund awarded; multiplier of 6.96); *In Re IDB Communication Group, Inc.,* Sec. Litig., No. 94-3618 (C.D.Cal. Jan. 17, 1997)(Hupp, J.), cited at 19 Class Action Reports 472-73 (1996) (16.5% of $83 Million fund awarded; multiplier of 6.2); *In re RJR Nabisco,* 1992 WL 210138 (25% of $72.5 Million fee awarded; multiplier of 6); *In re Charter Communications, Inc., Securities Litigation,* 2005 WL 4045741, 18 (E.D.Mo. 2005) (20% of fund awarded in recovery of $146,250,000, multiplier of 5.61); *Roberts v. Texaco, Inc.,* 979 F.Supp. 185, 197 (S.D.N.Y. 1997) (fee award of approximately 16.7% of the fund, multiplier of 5.5, plus fund set aside to compensate for post-settlement work); *Di Giacomo v. Plains All Am. Pipeline,* Nos. H-99-4137, H-99-4212, 2001 U.S. Dist. LEXIS 25532, at 31, 2001 WL 3463337 at 10 (S.D.Tex. Dec. 18, 2001) (awarding 30% of $29.5 Million fund; multiplier of 5.3); *In re Beverly Hills Fire Litigation*, 639 F. Supp. 915 (E.D. Ky. 1986) (fee of $4,121,926 in settlement of $14 Million; multiplier of 5 for lead counsel); *Kuhnlein v. Department of Revenue*, 662 So.2d 309, 315 (Fla. 1995)

(class fund award of 10% of $188,100,000, resulting in multiplier of approximately 15, reduced by Fla. Supreme Court to multiplier of 5 times lodestar, because lodestar was proper method under Florida law); *In re Xcel Energy, Inc. Sec., Derivative & ERISA Litig.*, 364 F. Supp. 2d 980 (D. Minn. 2005) (25% of $80M settlement; multiplier of 4.7); *Wilson v. Bank of Am. Natl. Trust & Savs. Assn.*, No. 643872 (Cal. Sup. Ct. 9/16/82) (multiplier of 10 times then hourly rate of $150), cited in *Newberg*, 14:6, p. 578, fn.87; *Cosgrove v. Sullivan,* 759 F.Supp. 166, 167 n.1 (S.D.N.Y.1991) (1% of $100 Million right to Medicare reimbursement awarded, resulting in multiplier of 8.74). *See also* Declaration of Stuart J. Logan, the editor of the *Class Action Attorney Fee Digest*,  submitted by Class Counsel (providing a list of 8 unreported cases from the past two years with a multiplier of more than five, with three having a multiplier of 6-7.46 and three with multipliers of 7.47-10.26).

   In *Bynum v. District of Columbia*, 412 F. Supp. 2d 73 (D.D.C. 2006), which was an over-detention and strip search case, the Court awarded a fee of 1/3 of the $12 Million fund, plus costs. Mr. Litt was counsel in that case. Judge Lamberth observed that 1) plaintiffs "engaged in protracted efforts over a period of four years to obtain this settlement, which the court considers to be an outstanding settlement both in its monetary and in its non-monetary terms," leading to an "exceptional" result. The result here certainly was comparable to or better than in *Bynum*. The litigation was "complex…, involving novel issues, and the effort that went into the results reflects that fact," and "[e]xtraordinary effort went into the resolution of these cases, not only through litigation, but through many hours of mediation." Those statements are equally applicable here. Similarly, the issues in both *Bynum* and *Craft*, were "hotly contested both on their merits and on whether a class would be certified" and the "outcome… was unclear and subject to serious risk of lack of success at the time the cases were filed and during the course of the litigation. The court is aware that cases of this nature are extremely risky and burdensome for

1  plaintiffs' counsel." In both cases,"[c]lass counsel did an outstanding job and

2  obtained exceptional results for the class", and "substantial benefits were conferred

3  on the class beyond the monetary recovery for the class, in the form of …

4  significant policy changes" which is a "substantial factor in the court's

5  determination of the appropriate fee." Finally, "[t]he attorneys involved in this

6  litigation on behalf of the class are experienced and capable civil rights attorneys."

7       This settlement compares favorably with that one in several respects. The

8  per capita recovery by class members here (based on the total class size) is

9  significantly larger than in *Bynum*, and the changes to jail administration here to

10  conform to the new policies were funded completely separately from the class

11  fund, unlike in *Bynum* where the changes were partly funded by the class fund.

12       This settlement also compares favorably with *Williams v. Block, supra,*

13  settled for $27 Million total, including a statutory fee of $5.5 Million negotiated in

14  connection with a related state court taxpayer's suit for injunctive relief. The trial

15  court awarded an additional 20% of the remaining class fund ($21.5 Million) in

16  attorney's fees, which meant that the total percentage of the $27 Million fund that

17  went to fees was 35.47%, plus expenses, substantially more than what the Court

18  has awarded here.

19       As in *Williams*, "Class counsel did an outstanding job and obtained

20  exceptional results,… substantial benefits were conferred on the class beyond the

21  monetary recovery for the class, in the form of the significant policy changes in the

22  operation of the County Jail, …class counsel are among the leading civil rights

23  litigators in the state, …Barry Litt is considered one of the outstanding civil rights

24  litigators in California, with special expertise in class actions, [and] the other

25  attorneys involved in this litigation on behalf of the class are highly regarded,

26  experienced and capable civil rights attorneys…."

27       The 25% figure requested here compares favorably with the general

28  percentage of recovery awarded in cases around the country, where the percentage

of the fund award is generally higher. *See* Silber and Goodrich*, supra; In re Rite Aid Corp. Securities Litigation*, 396 F.3d 294, 303 (3rd Cir. 2005), citing three studies ("[O]ne study of securities class action settlements over $10 million ... found an average percentage fee recovery of 31%; a second study by the Federal Judicial Center of all class actions resolved or settled over a four-year period ... found a median percentage recovery range of 27-30%; and a third study of class action settlements between $100 million and $200 million ... found recoveries in the 25-30% range were 'fairly standard.'") (citation omitted).

In awarding percentages of the class fund, courts frequently take into account the size of the fund. Often, but not always, fees of less than 25% will be awarded in megafund cases (cases of $50 Million or more). *See Vizcaino v. Microsoft Corp.,* 290 F3d 1043, 1052 (9th Cir. 2002) (Appendix lists percentage of fund fee awards in cases with class fund of $50-$200 Million from 1996-2001, showing approximately ½ above 25% and ½ below 25%). Cases of under $10 Million will often result in result in fees above 25%. *See Van Vranken v. Atlantic Richfield Co*., 901 F.Supp. 294, 297-98 (N.D.Cal. 1995) ("[m]ost of the cases Class Counsel have cited in which high percentages such as 30-50 percent of the fund were awarded involved relatively smaller funds of less than $10 million", citing cases). For cases of the size of this fund, 25% is very much the norm.

This case is neither a megafund case in which fees more commonly will be under the 25% benchmark, or an under $10 Million case in which they are often more than 25%. Thus, 25% of the fund is the appropriate percentage absent some strong reason to make an upward or downward departure. To the extent there are such factors, they would militate in favor of an upward departure. However, the lodestar cross-check indicates that there is no reason for an upward departure in this case.

## IV.    CONCLUSION.

The Court finds that Plaintiffs' counsel obtained an excellent result in a complex and risky case. The size of the fund is large but not in the mega-fund category. The damages class numbers approximately 150,000, over 20,000 claims were filed, and tens or hundreds of thousands of future inmates have benefited from the policy changes brought about by this suit. The wide spread pecuniary and non-pecuniary benefit created supports an attorneys' fee award which provides counsel with an incentive for undertaking future complex and risky litigation. The Court recognizes the skill and experience brought to bear by class counsel throughout the approximately three years they spent litigating and settling this case, and the economy with which they were able to achieve a noteworthy settlement. Having also considered the time invested in this case by counsel, which resulted in a lodestar of approximately $1,200,000, and the awards in comparable cases, the Court finds that 25% percent of the Settlement Fund results in a fair and reasonable award of attorneys' fees and costs in this action. The Court further finds that this award is justified by the high caliber of Plaintiffs' counsels' work in this case. Although the percentage of recovery represented by the fee in this case represents a larger than average enhancement above lodestar, it represents an average of below average percentage of the fund award for comparable cases.

Class counsel are awarded an attorney's fee $6,375,000 (25% of the class fund) as attorney's fees, plus $70,564.64 in costs.

IT IS SO ORDERED.


DATED:  April 01, 2008

*[signature]*

STEPHEN G. LARSON
U. S. DISTRICT JUDGE

1  Submitted by:
2  LITT, ESTUAR, HARRISON & KITSON, LLP

3

4  By :   _/s/  Barrett S. Litt_____
            BARRETT S. LITT
5           Attorneys for Plaintiff Class

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28